Case number 17-1012, Airline Pilots Association International et al. Petitioners v. Elaine L. Chao, Secretary of the United States Department of Transportation. Mr. Bailey for the petitioners, Ms. Swingle for the respondent. Good morning. Good morning. May it please the court, I'm Russ Bailey. Four petitioners with me today is Dave Symanczyk from the Airline Pilots Association. We are challenging DOST's decision to grant a foreign air carrier permit to Norwegian Air International under the U.S.-EU Air Transport Agreement. The Air Transport Agreement contains a labor article unique among air services agreements. That article, Article 17bis, was placed in the agreement in response to concerns that airline labor had about the possible use of economic opportunities provided by the agreement by European Union carriers. That article expresses the intent of the parties that the opportunities created by the agreement are not to be used to undermine labor standards. The article also says that this intent is to guide the parties... Yes, Judge Santel, do you want to ask a question? Yes, I would like to ask a question, or at least ask that counsel get to standing at some point, because you have to establish that before any of the rest of that matters. Can you address specifically whether the flight attendant's case is a controlling precedent that holds against you a standing? I'm afraid I missed part of that question, Judge Santel. I think Judge Santel is asking as to your standing whether or not you are controlled by the air pilot's decision. The flight attendant's. The flight attendant's. The flight attendant's, excuse me. Yeah. No, we do not believe we are at all, Your Honor. There's a long string of competitor standing cases in this and other circuits. Your Honor, this is not a standard competitor standing case. This is factually, apparently very similar to the flight attendant's. You're not in direct competition. Nobody is with the airline that's being granted the rights. So why does the flight attendant's control rather than any other precedent? Because each of the competitor standing cases we cite, Your Honor, they basically recognize that workers in their unions suffer competitive harm when an agency's lift regulatory restrictions that allow foreign workers to compete with U.S. workers in their markets. And that's precisely what we have here. We have affidavits in our brief that show that we have thousands of pilots and flight attendants who compete on the transatlantic services, and the Department of Transportation has issued a permit to Norwegian Air International so that they may operate in those very markets. And each of these cases, both before and after and in this circuit and in other circuits, uniformly hold that unions and their workers have competitive standing in that type of circumstance. The AFA case seems to be a little bit of an aberration. It really does seem to be an outlier from this long string of competitor standing cases, and I note that that case did not mention the competitor standing cases, and I note that the Department of Transportation brief did not mention those cases either when they challenged our standing. Thank you. Going back to our article, Article 17bis, expressing the intent, the opportunities created by the agreement are not to undermine labor standards and that the intent is to guide the parties as they implement the agreement. For my clarification, is your position that even if the three conditions you requested had been included, that you would still be opposing approval of the application for the permit? Your Honor, that's a very good question. We didn't have that opportunity to make that decision. We do believe that for the reasons we state in our briefs, that the Department's decision should be vacated. That was an alternative argument for us on the conditions, that if the Department did decide to grant a permit, that in that case it should place conditions on the permit in order to mitigate labor harm. Well, I ask that question for two reasons that I'm sure you appreciate. One, I understand your argument that you asked for these conditions and the Department has never responded, and therefore we should at least remand so that the Department will respond and you have an opportunity to respond to their response, et cetera, and see what can be worked out. But I'm also trying to understand, it seems that the Department's position has been that unless Article 17 would authorize the Department to disapprove or not approve the application, then it's more or less irrelevant to the question of approval of the application as such, as opposed to what I understand in part to be your argument, that you do think it is independent ground for rejecting the application, but even if it isn't, the application is, at least the Department's approval of it, is legally deficient because it has given no meaning to Article 17. Is that your argument? Yes, and I thought you were going to take it even one step further. That is our argument. Article 17bis does provide an independent ground for turning down an application, but even if it doesn't, it should inform the public interest test. It should be part of the public interest test. Article 17bis has a purpose and a meaning. It has its own instructions. It has its own objectives. The objectives are that labor standards are not to be undermined by use of opportunities under the agreement, and the intent is that that principle shall guide the parties as they implement the agreement, and there's nothing more central to implementation of the Air Service Agreement than the grant of a foreign air carrier permit. And so we believe that Article 17bis, if it's not an independent basis, which we are not for a minute conceding that it's not, that it should at least be part of the public interest analysis. The public interest analysis, which one of the components set out in the statute, is that DOT is supposed to consider whether or not its action encourages U.S. approval. I know, but that's connected in the statute to the previous provision with an or. So let's assume that that doesn't get you anywhere. Just for the moment, for purpose of argument, is your argument that even if the Department was not obligated to make a separate public interest obligation, it has to do more than look to Articles 4 and 6 when it determines whether to approve this application? In other words, I'm trying to understand in the ideal world, would you want sort of chapter and verse about minimum wage, hours, what are you seeking? That's impractical. That would be impractical, Your Honor. I understand, and I'm trying to figure out between that and sort of the aspirational thing. So one of the things I really urge you to take a look at, and which the Department did not take a look at, none of the agencies looked at this. It's a negotiating history of Article 17bis. And if you look at that, you'll see what the purpose of Article 17bis was. The idea was to have a general article that could have a flexible application on a case-by-case basis in response to use of opportunities under the agreement. All right. I did read that, or at least what's in the record before us, and that's what I'm trying to understand exactly what you understand the purpose to have been. This is not sitting down, as I understand it, and negotiating a labor agreement as such. Absolutely not. But what is it?  Minimum wage? No, absolutely not. It's a use of an opportunity under the agreement, and that's what we have here. The Air Service Agreement goes on month in, month out, year in, year out, with multiple EU carriers coming in and getting authorization from the Department of Transportation without labor opposition. We have an exhibit in the agreement showing just between 2007, when the agreement came into effect, and 2014 that there were at least 40 applications of European Union carriers that were 40 European Union carriers received operating authorization with no opposition. Since then, there's been dozens more. All right. So you know how in this country we have various national standards for various industries. Is that what's contemplated some international code almost? No. In fact, Your Honor, you'll see if you take a look at the European Union appointed an examiner to take a look at the labor's issues during the negotiations, and he took a look at that, and he says there's no way, there's no time to have international standards. We're not doing that. What we need to have is something that's broader and flexible, and that's what we have. Something that when a case comes along like this one where you have a foreign airline that comes in to specifically use an opportunity under the agreement, in this case, Norwegian was established in Ireland because its parent company did not want to have Norwegian labor laws apply to it. And you'll see that all over the record at the beginning of the record between pages 50 and 70, the reasons Norwegians said it was going to Ireland. And the reason was to get out from under Norwegian labor standards, and Ireland would let them do what the Norwegian government wasn't going to let them do, which was to use Thai and Singapore contract pilots on their transatlantic services. And we thought that was out of bounds, and so that's why it's the first case that we have opposed. This is exactly, and I think if you look at the negotiating history, it's this flag of convenience type of business model is exactly what Article 17 was about. All right, so that's something very specific. All right, and that's reflected in the negotiating history in terms of what was of concern. Did you propose to the department at some point a list of principles? No, we did not, Your Honor. We did not. By propose to the department, I take it you mean during the negotiations of the air service agreement? As to this airline, yes. No, we didn't, other than we felt at this point we had the agreement in place, we had Article 17bis, and it's not only Article 17bis. It's also the public interest, and the public interest has to be applied here, too, because under the air services agreement, in Article 4 of the air services agreement, it says the other laws and regulations normally applied to air service operations. That includes the public interest test, and we would say at a minimum if Article 17bis doesn't provide an independent basis to deny the application, it at least has to be considered as part of the public interest test, which also includes a component the Department of Transportation is supposed to look at, whether its actions encourage fair wages and working conditions. What do you make of the department's statement that it took everything into account, including the president or the executive director's letter, as to what commitments he was going to make in terms of hiring, et cetera, under this agreement? Well, Your Honor, sop and eyewash are harsh words, but I think those words apply here. His commitments in no way addressed our concerns. Well, but the department may not have, but it did address his. His commitments did not either. Well, you wouldn't disregard them, I assume. The way I read them, they might be of some interest to your members. But at any rate, let's assume. No, and I think it's important to explain why. Why what? What he committed to do, his commitments, his commitments did not satisfy us. He just committed to doing what he was already doing. He committed to continue to use U.S. and EU citizens. Our concern is not the citizenship of the pilots and flight attendants. It's what contracts are under. And the contracts they're under are Singapore and Thai contracts. And that's what we want. We want to have the pilots and flight attendants under U.S. or EU contracts, not under Asian contracts, short-term Asian contracts. You'll see the contract on the contracts in the record. Short-term Asian contracts with no opportunity for collective bargaining representation. And we just felt that was out of bounds. That was using an opportunity created by the agreement, specifically created by the agreement. This opportunity did not exist prior to this agreement, this opportunity for a European carrier to set up a subsidiary in another country and have it fly to the United States. That was a novel, unique opportunity created specifically by this agreement that one of the responses was that there would be a specific, unique labor agreement that would some way address the concerns that would be posed by the use of these economic opportunities. And I'm running out of my time. You may be, but from my point of view, you haven't gotten to the major problem, it seems to me you have here, which is even if you write about Article 17 and its history and its importance, the statute gives the department two different avenues for approval. One is under 2A, which is designation by an applicant's government under an international agreement. That's happened, right? That's happened here, right? And then it says or. It doesn't say and. It says or if the permit is in the public interest. So you don't get to the public interest analysis at all under this statute. If it's covered by A, I don't understand. You have to explain to me why that doesn't just end the analysis. I'm sorry. Your Honor, as you might suspect, I'm going to disagree with you. Well, I suspect you do. And let me explain my disagreement. Should I read? Well, go ahead. Tell me. It says or, right? It says or, but up above it says may. Yeah, but you agree that 2A is satisfied, right? This is covered by 2A. Yeah, 2A is satisfied. So it says it may do it under A or B. Now, it's done it under A. So explain to me how you get to B. And if you look at the legislative history. Wait, wait, wait. Don't go to the legislative history. You can get there in your next answer. Stick with the language. All right. Tell me how, with this language, given that this is covered by 2A, we could require the Department to make a 2B finding since it says or. Because the statute does not require the Department to issue a permit. It says it may grant a permit. The Department has always interpreted the statute and its predecessor, or the Civil Rights Board before it, interpreted the statute to mean both. Even though that has the option, they have always, always made a public interest finding in every case for the last half decade except in our case. It's the only one, and they have not provided a rational explanation of why they deviated from their practice. And their practice is set up. Well, maybe they were violating the statute for the past number of years. I still don't see. So your argument about the or is we should ignore it because the Department has never taken it seriously? No. Is that your point? No, no. The point is that it's always been discretionary, and you'll see that in the legislative history. Congress said. Wait, wait, wait. Always been discretionary under whose terms? Who says it's always discretionary? The Department? I'd say the Department's practice and also Congressional legislative history which says that this provision still empowers. Okay. We have very clear case law here in the Supreme Court that if a statute's clear, that's the end of the matter. That's it. We don't look at legislative history to create ambiguities in otherwise clear statutes. And we also have cases which say that a clear statute doesn't become ambiguous simply because an agency has violated it for years. So am I right then that your argument about this or separating 2A and 2B turns on A, the legislative history, and B, agency practice, right? No. Is there anything else? Yes. What is it? The statute itself which says that the Department may grant. It doesn't say shall grant. It says it may grant. I don't understand how that helps. If it may do it under A, it's done it under A, right? Let's see. I guess I don't get how it may help you. I think the way it says may grant. It doesn't have to. The Department's already retained its authority to do that. Congress recognized that at the time that it passed the Act. The Department retained its power and the Department's exercised its power. And what has been applied is what's set out in the Department's guidelines for foreign air carrier permits in which it states expressly that the one public interest factor that it considered in its order, which is whether or not the routes are provided under the Air Service Agreement, that is one of several factors to be considered. And among the factors that are to be considered, and this is what foreign carriers are advised when they come to DOT and they take a look at what the guidelines are, they're advised that this is a public interest test that applies. And one of the factors is whether the rights exist, and another factor is the merits of the pleadings that are filed in opposition to the application. And in this case, we filed voluminous pleadings, as you might imagine, and explaining the harm that would be created by the grant of a permit, Norwegian Air, to our pilots and flight attendants. Would you like to save the rest of your time for rebuttal? If I have time, I'd like to save it for rebuttal. Yes, thank you. Counsel for Respondent, good morning. Good morning. May it please the Court, Sharon Swingle from the Department of Justice for the Secretary of Transportation. If I may, I'd like to begin with standing. I think petitioners were on notice here from the outset that their standing was not self-evident from the administrative record. As Judge Sentell earlier noted, the flight attendant's case involved virtually identical facts to this case. There, a group of airline crew of legacy carriers challenged the FAA's grant of a permit to Virgin Airways on the ground that Virgin would take market share from the legacy carriers and lead to reduced work and pay for the crew of those other carriers. And this Court held that the petitioners there were required to submit evidence establishing standing at the earliest opportunity, that is with their opening brief, and also that the declarations that were submitted in that case failed to establish Article III standing. So what of the declaration attached to the reply brief in this case? So I would say that should not even be properly considered by the Court. I understand that is the thrust of your argument. I'm asking you to address it. Absolutely, Your Honor. Although I will say this Court's cases are very clear that the reply brief is- American Library Congress versus the FCC, for example, and other cases. So will you address the declaration attached to the reply brief? I will, Your Honor. I think those declarations, even if considered by the Court, are completely inadequate to establish standing here. The thrust of the theory of standing here is that there will be pressure brought to bear that will reduce the wages and salaries of the existing employees. Frankly, every step of that causal chain has failed to be established. First, there is no evidence that Norwegian Air will, in fact, adopt the labor practices about which petitioners are apparently concerned. Norwegian Air's leadership has made a voluntary commitment not to adopt those labor practices. So standing would only arise at the point, let's suppose petitioners oppose work condition A. Right. The agreement is approved, it goes into effect, and the carrier implements condition A. Then what? Well, I think obviously if there were a non-speculative likelihood that condition A would go into effect and that condition A would impose injury on petitioners, we would have a different case here. So what about sort of the law of economics argument that's basically what is made in the reply brief declaration? So under this circuit's law, they need to show that it is a virtual certainty that that economic injury will happen. Just as a historic matter, I would point out that Norwegian Air has already had another affiliate that has been operating out of Ireland to the United States since 2014, and that is exactly the affiliate that was claimed to have adopted the harmful labor practices, and yet there is no actual evidence that has been submitted that those harms. So what you would require is actual harm under another agreement with a foreign carrier. I don't think we would require that, Your Honor, but I think it is telling that, in fact, one would expect if there were evidence of harm resulting from the kind of labor agreements that they complain of, they have not actually substantiated it, and there is historic practice that would have given rise to actual evidence that they could have done so. Well, that's what you're telling us at this point, and they have submitted an affidavit by somebody who's been in the business, how many years did he say, at all levels and all circumstances, including the one at issue. Who looks to historic practice, and yet that was not sufficient for this court in flight attendance to assume that there would, in fact, be competitive injury.  simply because another carrier comes into the marketplace, one can assume competitive injury. Well, this affidavit goes further than that, however, and that's why I'm trying to understand the level of specificity you would want. Would you want an affidavit that says Mr. Jones, a pilot, used to make, I don't know, $200,000, and now he's making $50,000? Well, I think one would expect a closer nexus between, I mean, their affidavit turns on the predicate that any time a new market competitor enters the marketplace, the employees of its competitors can be presumed to be injured, and I don't think this court's competitor standing cases support that inference. I don't know that in our competitor standing cases, though, we've required quite the type of level of injury. In other words, we've said the owner of an industry doesn't have to wait until he's got a closed shop before he can come into court. He can see the handwriting on the wall because the economic laws are as plain as the eyeglasses on your head. But those have been in cases in which the petitioner was, in fact, the direct competitor of the market entering, right? We're not taking the position that if United Airlines were the petitioner here, that they could not bring a case under the competitor standing cases. So what about the employees of the competitor standing cases? So I think in the cases in which this court has let employees come in, there has been a much more direct impact because the challenged government decision allowed people to compete against those employees who otherwise would have been foreclosed from competition. All right. I think we have your argument on standing. Yes. And you may prevail on that. I don't know. But could we move on? Well, can I? I have a question about standing. Oh, Judge Tatel has a question. Yeah. So, you know, when I first read these briefs, it seems to me you were exactly right. In fact, I didn't think I had to go beyond standing. It just didn't seem to me it met our standards. But then I came across International Brotherhood of Teamsters versus DOT, which is cited at the reply brief at page three. Are you familiar with that case? That's the one about the Mexican trucks. Yeah. Right. Are you familiar with that case? I am, Your Honor. Huh? I am, Your Honor. You're not? I am, Your Honor. She says she is. Oh, you are. Well, why doesn't that make standing self-evident in this case? We said that an association of truck drivers had standing the challenge of DOT program, which allowed Mexican truck drivers to operate in the United States. And we didn't cite any. We just based it on the law of economics. There were no affidavits. We said, well, how do you distinguish that case? So, and I will admit, Your Honor, I think the court did not provide an enormous amount of reasoning for its decision. Right. There's one sentence. But this is our latest case on this subject, and it says, quote. And that was a big case. It says, quote, absent the pilot program, members would not be subject to increased competition from Mexican dynostyle trucks. And you could say exactly the same thing here. Absent Norwegian air, petitioner members would not be subject to increased competition from the red lights. It seems like right in point. So I think the key distinction would be, and I would also point to this court's decision in the bricklayers case, which is cited in the reply brief, which is that the Mexican truckers, but for the pilot program, would not have been able to work in the United States, and hence would not have been in the competitive marketplace. No, no, this was the Mexican. This was, it was. No, you think, but not for NAFTA. The Mexican truckers would not have been here. In the same way as the bricklayers case, or the case involving the Canadian crew members on the ships. It's an instance in which literally those foreign workers could not have been in the market taking the jobs of Americans. So let me take it one step further. Excuse me, that wasn't the point of the case. This was, I'm sorry, this was, the argument there was that these Mexican companies, the companies, by paying their workers less, would adversely affect American truck drivers. It's exactly like this case. I don't, I get your, I understand your point. I see exactly why you wrote the brief the way you did. But I don't see how we were rattled by this case. And this case seems to say, under facts just like this, that standing is self-evident based just on the laws of economics. So I think, Your Honor, that decision needs to be read congruently with the rest of this court's case law, including, for example, the flight attendants case, in which the court said quite clearly the mere fact that Virgin is coming into the market and flying competitively with U.S. legacy carriers was not sufficient to show a competitive injury that would give its crew members standing. I think one needs to look at the kind of... Well, can you find a way, can you find a way for us to rely on... Do we have to say that this decision's wrong? No, absolutely not, Your Honor. Why? I think the problem here... I mean, we really can't do that. We have no which decision. Let me ask you a question in that regard. If the two cases are inconsistent, and since it's the law that one final case overruled another, as the title was suggesting, isn't it the case that that later decision, factor decision is wrong, and the earlier case actually controls? That would, of course, be the general rule, but I don't think it's necessary to go to that general rule because I think the real distinction here... And perhaps I can turn to another case that I think illustrates what the distinction is here and contrast it to the facts of this case. In our case, we have no reason to believe, from the declarations or from anything in the administrative record, that the pilots and crew who will be coming on Norwegian Air's flights are any different, are any different nationality, any different background, any different citizenship than the pilots and crew who are currently operating on the legacy carriers, the crew members of which are the members of the petitioners here. Actually, there is some suggestion in the record that we do know that there will be a difference. So, Your Honor... Because they are hiring, they're using, what is it, the Thai companies. They're using a third-party staffing company that has contracts under Thai or Singaporean law, but there's no reason, they do not assert that the nationalities or citizenship of the pilots and crew are different. But the citizenship is not the issue. Well, I think it's important because, obviously, depending on where the flights are domiciled, depending on where their crew are domiciled, labor laws control, national labor laws control. Well, that's what I was going to get to. Here we have this international agreement that has Article 17 in it. Right. And who is going to be affected, for good or ill, by Article 17? And at least, not looking at the legislative history, but looking at the negotiating history in terms of at least what some understood was the purpose of Article 17. Why doesn't that distinguish these other cases? I mean, the Mexican and the U.S. employees didn't have any special provision in the NAFTA agreement as such that was being relied on in those cases. I'm not familiar enough with the agreement in the Virgin Air case. In other words, my hypothetical earlier was, the department approves the application, the carrier starts operating, and it implements Condition A. And Condition A is exactly what the petitioners were opposed to and tried to get the department to address. Then they come in and sue? I mean, wouldn't they just be thrown out of court? Well, I don't think so, Your Honor. Well, the carrier has an agreement. There's nothing in the agreement that said he had to avoid Condition A. Well, obviously the claim here is that the mere grant of authorization to operate is going to impose imminent and substantial harm on petitioners here. Whatever the case may be there, and we are certainly not contesting the zone of interest or prudential standing, they do have a requirement to show Article III injury here. And with all due respect, beyond speculation about how this would impact them, and in the face of a history in which there is already another carrier claimed to follow the same disfavored labor practices, and yet they have shown no evidence that that has actually impacted them in any material way, I just think the injury here is speculative. And could you just say once again, so I understand, and picking up the point Judge Sentell made, which is that if we have two decisions in conflict, we're obligated to follow the first, right? Yes, Your Honor. And so explain to me why that principle doesn't come into play here. Because, Your Honor, we don't believe that those decisions are, in fact, inconsistent. Yeah, I know, but why? And I think it's because in the Mexican trucking cases, in the bricklayers case. No, just do the Mexican truck drivers. So I think it's a circumstance in which, but for the government's decision to institute that pilot program, the drivers of those trucks could not have worked in the United States. They would not have been part of the competitive labor pool that affected the U.S. truckers there. And the difference here? We have no way or reason to know that. We don't know who the pilots and crew are and whether they are already part of the competitive labor pool here. I mean, obviously, Norwegian Air, in its submissions, talks about hiring substantial numbers of U.S.-based. But the case says, it says that absent a new program, quote, members would not be subject to increased, members of this Truck Drivers Association would not be subject to increased competition from Mexican domiciled trucks operating throughout the United States. Isn't that exactly the same here? Except it's airplanes, not trucks. In other words, you could say exactly the same thing. Absent Norwegian Air, petitioner's members would not be subject to increased competition from the new airline. I don't get the difference. Well, Your Honor, I don't think that understanding the case to mean simply that whenever a new market entrant comes in, any employee can challenge it. That would not be consistent with the way this Court has described the competitor's standing cases as narrow. So we do need to invoke the rule that Judge Sentil suggests. We need to say this case is inconsistent with our precedent. I think that case did not fully elaborate on the Court's reasoning, and I would simply point the Court to the other earlier cases that have all turned in part on what would otherwise have been a legal barrier to entry into the competitive marketplace for the employees at issue. I think in the instances in which this Court has permitted competitor standing, where someone was not a direct competitor but the claim was being brought by the employees of the new competitor or the legacy competitor, it has involved that kind of otherwise categorical restriction on entry into the marketplace for the employees of the new competitor. If I could turn briefly, though, to the merits. I think the Court is exactly right that petitioner's argument here requires reading or as and under the statute. There is no basis for that in the plain language. I would like to just briefly discuss Judge Rogers' questions about the denial of the request to impose conditions on the permit. When you say denial, the sub salentio denial? Well, the Court, if I can just answer that in a couple of ways. Well, I read what you said in your brief. In the final order, the Department of Transportation did, of course, specifically deny all other requests for relief that had been made in any of the objections to the order to show cause, as this Court is likely. So it is, you're arguing, just a sub salentio? Yes, Your Honor, and not even. And yet. Well, not sub salentio, Your Honor. And yet the Department put all these conditions on the foreign air carrier permit. So the Department put standard conditions but did not put. If I could point the Court to the joint appendix at page 501, that is the only request that was made by the airline pilots for conditions. It was very much an afterthought in their objections. They asked for those conditions to be imposed under Article 17. All right, but you're not arguing they didn't ask. No, Your Honor. They didn't write a book, okay, and I brought out they didn't give you a set of principles either. And no explanation for the conditions that they suggested as illustrative. But, again, they're sort of self-evident, it seems to me. So the Department isn't suggesting that. That wasn't the position you took in your brief at all. No, and I'm not suggesting that, but I would say that the Department did in fact address the substance of that request in its analysis of Article 17b. No, see, that's what I'm getting at. The question that your counsel answered and the question that your department, your counsel, that is General Counsel of the Department of Transportation, asked the State Department and the Office of Legal Counsel to answer was different. It said, tell us whether or not Article 17 is an independent basis on which the application for the permit can be denied. And everybody said no. That's not the issue here. That's all I'm getting at. That's correct. And that was, of course, the thrust of the bulk of the objections to what was done. But they had an alternative. They did. They said, if we can't get the whole loaf of bread, we want some slices, namely these conditions. And, Your Honor, if I may. And where did the Department say anything about those conditions? So, as you know, it was the Department's view, and it's construction of the treaty, that under the statute and under the agreements, the labor-related objections were not a basis for unilaterally denying the application. But, as you know, at 572 and 573, in its final order, the Department did consider the labor-related objections that had been raised, and it took into account the commitments that had been made, which would not have been relevant under the Department's view to the approval decision as a whole. And I don't know how those are enforceable. What you said, or what the Department said in the permit is, and we trust those commitments will be followed through. I mean, that's not part of the – I mean, can I sue on that? And the point of the objection was that we should consider labor-related issues under Article 17b. And my point is simply that the Department did, in fact, do so in reaching its final conclusion that it was not going to grant any of the other requests for relief that had been sought in the proceedings, which I think effectively disposes of that request for conditions. Yeah, and I thought you were going to argue Article 17, Paragraph 2 gives them – And I agree it does. It gives them broad-ranging discretion to decide how to consider those. Right, and also the commission. Exactly. All right, anything critical that you wanted to say? No. Thank you very much. Thank you, Your Honor. All right, counsel or petitioner, we'll give you a couple of minutes. Okay, I'll do my best here. First thing, on standing, I think the AFA case, the Virgin American case, can be distinguished by the fact that that's – for no other reason, it was a domestic airline, not a foreign airline, so we're talking about U.S. citizens. It was just a license to a foreign carrier. Wait, what's the difference? Virgin America was a U.S. license, not a foreign air carrier permit, so we're talking about U.S. citizens rather than foreign workers.  Okay. But you're not suggesting that – No, my real argument is Mendoza and the IBT versus DOT case. Both of those were after the AFA case, and both of them made it clear that there was – that a lot – where an agency allows foreign workers to come in and compete against U.S. workers in their markets, and the transatlantic market is a market where we work, where agency action allows the entrance of foreign workers, that unions and their members suffer constitutional harm as a result of that action. With respect to the notion that we didn't put anything in the record about what Norwegian's parent company was doing, well, they didn't enter the Irish market until after this case was over, so there was no opportunity to do that. So – And on the harm and what's happening in the marketplace, you'll see the record is full of our requests for information, both – you know, we asked for information, we asked for documents repeatedly from DOT that would go precisely to these issues. Who was on the aircraft? What are their terms and conditions of employment? DOT never granted any of those and never got the information. So the reason the information's not in the record is because it wasn't requested by the department. It wasn't provided by the department. Pardon me? It wasn't provided by the department. You said it wasn't requested by the department. Yeah, well, we would have asked them to request Norwegian to produce that information. Oh, I see. So we were asking for basically a document production request, and we asked them to issue a document production request, and they didn't do that. All right, public interest. Again – I think we have your argument on that one. Okay, so can I say one thing about Article 17bis, though? Yes. Because you did give me a signal that maybe things weren't going to go my way on that – our way on that. Article 17bis, I agree with probably what is implicit in your comment, which is we're facing an armada. We have Department of Transportation, we have Department of Justice, we have Department of State, they all have their opinions. Well, it's not an armada. Pardon? It's not an armada. Under our case law, we have to defer to the State Department. That is correct. That is correct. It's not like they're lining up against you. They've taken a position, and you have a heavy burden to get us to second-guess them. I agree with that. And I haven't heard you say any of that yet. My analogy would be this, Your Honor. They look like the guns in Navarone at first blush. Deference is due to them, but deference is not advocation. Of course not. I ask you to take – we have a guideline in our brief at pages 20 to 23 listing all the omissions and contortions that those agencies made in interpreting Article 17bis. Mainly, none of them address the word shall, which is a directive word, and none of them address the word implement. And implement is granting a permit. And so the principles in that article shall guide the parties as they implement the agreement. Those words were not addressed. Those were castor oil words. They couldn't come to grips with them. So all I invite you to do is take our guidelines and take the text of Article 17bis and put it side-by-side with those agency decisions and take a look. In the record is an opinion by the former Deputy Secretary of DOT, who was Deputy Secretary while this agreement was concluded, and he says in his view the department's conclusions in this case twist Article 17 beyond recognition. I invite you to compare those two, compare Article 17bis with the agency said, and see if you don't agree with Mr. Picari. Thank you. Thank you. We'll take the case under advisement.
judges: Rogers, Tatel, Sentelle